*17 Pgs*
*Exhibit A*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>     v.<br><br>JOHN KALYMON,<br>a.k.a. IVAN/IWAN/JOHN<br>      KALYMON/KALYMUN<br><br>            Defendant. | **04-60003**<br><br>Civil Action No.<br><br>**JUDGE MARIANNE O. BATTANI**<br><br>Mag. Majzoub |

COMPLAINT

Plaintiff, the United States of America, by and through its attorneys, for its Complaint herein alleges as follows:

I. INTRODUCTION

1. This is an action pursuant to Section 340(a) of the Immigration and Nationality Act of 1952, as amended (INA), 8 U.S.C. § 1451(a), to revoke the citizenship of Defendant John Kalymon ("Defendant"), to set aside the order of the United States District Court for the Eastern District of Michigan dated October 11, 1955, admitting Defendant to citizenship, and to cancel Certificate of Naturalization No. 7536855, issued to Defendant pursuant to that Order.

2. Plaintiff is the United States of America.

3. Defendant is a natural person whose last known address was 1539 Devonshire Drive, Troy, Michigan, which is in the jurisdiction of this Court.

- 2 -

II.  JURISDICTION AND VENUE

4.  Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 (district courts shall have original jurisdiction of all civil actions arising under the laws of the United States), 28 U.S.C. § 1345 (except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions commenced by the United States) and by Section 340(a) of the INA, 8 U.S.C. § 1451(a) (an action to revoke citizenship is to be brought in a district court).

5.  Venue is proper in this District under Section 340(a) of the INA, 8 U.S.C. § 1451(a), which provides that an action to revoke citizenship shall be brought in the judicial district in which the naturalized citizen resides at the time the suit is brought.

6.  As required by Section 340(a) of the INA, 8 U.S.C. § 1451(a), an affidavit showing good cause for this action is attached as Exhibit A, signed by Dr. Elizabeth B. White, Chief Historian, Office of Special Investigations, Criminal Division, United States Department of Justice.

III.  FACTS

A.  Defendant's Activities Before and During World War II

7.  Defendant was born on May 16, 1921, in Komancza (Komantscha), Poland to Teodor and Anastasia (née Suszko) Kalymon.

- 3 -

8. On August 1, 1941, the Government of Nazi Germany incorporated eastern Galicia, in present-day western Ukraine, into the so-called Government General, a territory occupied by Germany that comprised the central and southern part of prewar Poland. The new Galician territory, designated District Galicia, was ruled from the city of L'viv, which the Germans called Lemberg. In August 1941, the German Commander of the Order Police for District Galicia directed the formation of Ukrainian auxiliary police forces ("Ukrainian Auxiliary Police") to aid German occupation authorities in policing District Galicia.

9. In District Galicia, overall control of security and implementation of anti-Jewish policy, including the mass murder of Jews, belonged to the SS and Police Leader ("SSPF"). Under the SSPF, a senior Gestapo officer oversaw all anti-Jewish measures.

10. The SS and Police Leader was at the top of a chain of command that extended to the Ukrainian Auxiliary Police. The members of the Ukrainian Auxiliary Police in L'viv were uniformed, armed, paid a salary, and were given various benefits by German authorities. Throughout its existence, the Ukrainian Auxiliary Police was operationally directed and controlled by Nazi security authorities.

11. Enforcement of Nazi persecutory policies regarding the Jews and other racial or religious groups in District Galicia was one of the principal responsibilities of German security authorities. The policy toward the Jews had three components.

- 4 -

First, all Jews in the district were confined in ghettos and
issued new identification papers that identified them as Jews.
Second, all Jews were forcibly removed from the ghetto for
subsequent murder either by shooting or gassing.  Third, a
limited number of these Jews whom the Germans considered "work
capable" were transferred to forced labor camps where many soon
died from starvation, disease and other inhumane conditions.
Nazi German security authorities depended on the Ukrainian
Auxiliary Police in L'viv to implement all three of these
components.

    12.  The Ukrainian Auxiliary Police in L'viv was organized
in "commissariats" (akin to precincts).  Each commissariat was
responsible for a geographically defined section of the city and
was tasked to enforce German rule, including day-to-day anti-
Jewish policies.

    13.  As of May 1942, Defendant worked for the 5th
Commissariat of the Ukrainian Auxiliary Police in L'viv.  The 5th
Commissariat (later renamed the 7th Commissariat) entirely
encompassed the city's Jewish ghetto and had the most active
contact with L'viv's Jewish population.  The precinct was also
contiguous with the northern edge of the Janowska Forced Labor
Camp at the west end of the city.  Defendant served in the
5th/7th Commissariat until at least September 1943.  Sometime
after September 1943, Defendant was transferred to the 4th
Commissariat, where he served until at least March 1944.

- 5 -

14.   On a routine and daily basis, the Ukrainian Auxiliary
Police in L'viv, including the 5th/7th and 4th Commissariats,
enforced the full panoply of Nazi persecutory measures against
the Jews in the city.   Ukrainian auxiliary policemen checked
personal identification documents and arrested Jews lacking
special work passes.   Ukrainian auxiliary policemen also arrested
Jews for failure to wear an armband with the Star of David that
publicly identified them as Jews.   Defendant, as an armed,
uniformed member of the 5th/7th and 4th Commissariats, had the
responsibility to enforce such laws on a day-to-day basis
throughout his tenure in the Ukrainian Auxiliary Police.

15.   The visible, public presence of uniformed, armed
members of the 5th/7th and 4th Commissariats of the Ukrainian
Auxiliary Police provided a conspicuous display of intimidation
in L'viv.   Jews, who saw the uniformed, armed members of the
5th/7th and 4th Commissariats and were aware of their
responsibilities and the abuses they inflicted, lived in fear of
them.   As a result, the Jews of L'viv more readily submitted to
Nazi anti-Jewish measures.   Defendant, as a uniformed, armed
member of the 5th/7th and 4th Commissariats of the Ukrainian
Auxiliary Police, contributed to that public intimidation of the
Jews in L'viv.

16.   In a series of operations conducted between March 1942
and June 1943, more than 100,000 Jews, constituting nearly the
entire Jewish population of L'viv and surrounding areas, were
seized, delivered to a central assembly point, and transported to

- 6 -

killing centers or forced labor camps.  Members of the 5th/7th
Commissariat participated in almost every ghetto reduction
operation.  Defendant was a member of the 5th/7th Commissariat
throughout this period and took part in some or all of those
operations.

17.  On May 11, 1942, after the first significant "ghetto
reduction," Defendant and another Ukrainian auxiliary policeman
were assigned to escort an unknown number of Jews to Pluhovo,
site of an SS-run forced labor camp about forty miles east of
L'viv.  In the course of this transfer operation, Defendant and
the other auxiliary policeman each expended six rounds of
ammunition.

18.  The "Great Operation" in the Jewish ghetto began on
August 10, 1942.  During this ghetto reduction action, the
largest such operation in Galicia during the war, patrols
composed of Ukrainian auxiliary policemen checked the identity
papers of Jews in the ghetto and swept systematically through the
apartment blocks looking for hiding Jews.  Jews whose documents
attested to employment in a German-sanctioned economic enterprise
were generally left at liberty in the ghetto; Jews who lacked the
necessary authentication stamps or documentation -- the vast
majority of the Jewish population -- were seized and delivered to
the assembly point at the Sobieski School.  During the two-week
operation, approximately 40,000 Jews were "deported," i.e., sent
either to forced labor camps or to the Belzec killing center,
where they were asphyxiated with poison gas.  In addition to

rounding up Jews to be deported during this operation, Ukrainian
auxiliary policemen, including Defendant, shot to death dozens of
Jews who resisted, fled, or attempted to hide.

19.  In a report signed by Defendant and dated August 14,
1942, Defendant wrote to his superiors that he "fired four shots
at 7:00 p.m. on 14 August 1942, while serving in the Jewish
operation.  One person was wounded and one was killed."  These
events are confirmed by a summary report filed on the same date
by the commander of the 5th Commissariat.  The report states that
on August 14, 1942, members of the 5th Commissariat delivered
2,128 Jews to a central assembly point.  It also states that,
during the operation, twelve Jews were "killed while escaping"
and another seven Jews were wounded.  Fourteen rounds of
ammunition were expended, four by Defendant and ten by three
other auxiliary policemen of the 5th Commissariat.

20.  On August 20, 1942, Defendant along with other
auxiliary policemen of the 5th Commissariat, acting in
conjunction with the German *Schutzpolizei* [Municipal Police],
delivered 525 Jews to the collection point.  A total of 14 Jews
who attempted to escape or who "offered resistance" were shot and
killed, while another six Jews were wounded.  Members of the 5th
Commissariat expended 49 rounds of ammunition during this
operation.  Defendant fired two of these rounds.

21.  The next day, on August 21, 1942, auxiliary policemen
of the 5th Commissariat rounded up and delivered to the assembly
point an additional 805 Jews.  During the operation, they killed

12 Jews and wounded three.  Defendant fired two rounds of
ammunition during this operation.

22.  By the end of 1942, L'viv's Jewish population had been
reduced to roughly 24,000 from over 100,000 just nine months
earlier.

23.  Following the "Great Operation," the 5th Commissariat
was re-designated the 7th Commissariat.  Defendant served in the
7th  Commissariat until at least September 1943.  In a roster
dated July 29, 1943, he is listed as "Guard Commander."  Sometime
after September 1943, Defendant transferred to the 4th
Commissariat, where he remained until at least March 1944.

B.    Defendant's Immigration to the United States

24.  In March 1949, Defendant sought a determination from
the United States Displaced Persons Commission ("DPC") that he
was a Displaced Person as defined in the Displaced Persons Act of
1948, Pub. L. No. 80-774, ch. 647, 62 Stat. 1009 ("DPA"), and was
therefore eligible to immigrate to the United States under the
DPA.

25.  In connection with his application to the DPC,
Defendant misrepresented his employment and residences from 1941
to 1944.  With respect to his residences, he falsely claimed that
he was in Kovanca, Poland from 1939 to 1943.  Regarding his
employment, he falsely stated: (1) that he was "an employee" in
Kovanca, Poland from 1939 to 1943; and (2) attended "Special
Driver School" in "Lwow," Poland from 1943 to 1944.

26. In making these claims, Defendant concealed his service from at least May 1942 until at least March 1944, in the 5th/7th and 4th Commissariats of the Ukrainian Auxiliary Police in L'viv.

27. Relying upon Defendant's misrepresentations, the DPC determined that Defendant was an eligible Displaced Person.

28. On or about April 21, 1949, Defendant filed an Application for Immigration Visa and Alien Registration with the American Consulate in Munich, Germany, to obtain an immigrant visa to enter the United States under the DPA.

29. On his visa application, Defendant misrepresented his residences from 1941 to 1944. He falsely claimed that, from 1939 to August 1943, he had resided in "Komantscha," Poland and from August 1943 to July 1944 he resided in Lemberg (i.e., L'viv), Poland. The application gives Defendant's occupation as "shop assistant."

30. On his visa application, Defendant concealed that he arrived in L'viv no later than May 1942. Additionally, Defendant concealed his service from at least May 1942 until at least March 1944 in the 5th/7th and 4th Commissariats of the Ukrainian Auxiliary Police in L'viv.

31. Defendant orally swore to the truth of the information on his visa application.

32. Based on the false information provided by Defendant to U.S. authorities, on or about April 22, 1949, Defendant was issued Immigration Visa No. 6068/53 under the DPA.

- 10 -

33.   Defendant used this immigration visa to enter the United States at the Port of New York on or about May 4, 1949.

C.   Defendant's Naturalization

34.   On or about September 15, 1955, Defendant signed and filed a Petition for Naturalization with the United States Immigration and Naturalization Service.  He orally swore to the truth of the information he provided therein.

35.   On October 11, 1955, the United States District Court for the Northern District of Illinois granted Defendant's Petition for Naturalization and issued to him Certificate of Naturalization No. 7536855.

IV.   LAW

36.   Under Section 340(a) of the INA, 8 U.S.C. § 1451(a), Defendant's citizenship must be revoked and his Certificate of Naturalization must be canceled if these were illegally procured or procured by concealment of a material fact or by willful misrepresentation.

37.   Section 316 of the INA, 8 U.S.C. § 1427, sets forth the requirements for legally procuring naturalized citizenship. Section 316 (a)(1), applicable to Defendant, provides:

> No person, except as otherwise provided in this title, shall be naturalized unless such petitioner, (1) immediately preceding the date of filing his petition for naturalization has resided continuously, <u>after being lawfully admitted for permanent residence</u>, within the United States . . . [emphasis added].

- 11 -

## COUNT I

### Illegal Procurement of U.S. Citizenship:
### Unlawful Admission under of the Displaced Persons Act
(Assistance to the Enemy in Persecution)

38.  Plaintiff realleges and incorporates by reference paragraphs 1 through 37 of this Complaint.

39.  As set forth in paragraphs 24 through 33, Defendant entered this country under the provisions of the DPA.

40.  To establish lawful admission under the DPA in connection with applying for a visa, Defendant had the burden of proving that he was "the concern of the International Refugee Organization."  Sections 2(b) and 10, Displaced Persons Act, 62. Stat. 1009, 1013 (1948).

41.  Annex I, Part II of the Constitution of the International Refugee Organization ("IRO"), 62 Stat. 3037-3055, identified certain categories of persons who were not the concern of the IRO, including:

> Any . . . persons who can be shown
>
> > (a) to have assisted the enemy in
> > persecuting civil populations . . .

62. Stat. 3051, 3052.

42.  Defendant's service with the Ukrainian Auxiliary Police in L'viv, as alleged in paragraphs 13 through 23, constituted assistance to the enemy in the persecution of civil populations. Defendant was thus ineligible to receive a visa under the DPA.

43.  Because Defendant was ineligible for a visa under the DPA, his admission into the United States pursuant thereto was unlawful.

44.  Because Defendant's admission into the United States was unlawful, his subsequent naturalization was unlawful under Section 316(a)(1) of the INA, 8 U.S.C. § 1427(a)(1).

45.  Defendant's citizenship thus was illegally procured and must be revoked, as provided for in Section 340(a) of the INA, 8 U.S.C. § 1451(a).

## COUNT II

### Illegal Procurement of U.S. Citizenship
### Unlawful Admission under the DPA
(Membership in a Hostile Movement)

46.  Plaintiff realleges and incorporates by reference paragraphs 1 through 37 of this Complaint.

47.  As set forth in paragraphs 24 through 33, Defendant entered this country under the provisions of the DPA.  Section 13 of the DPA prohibited the issuance of a visa

> to any person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States.

48.  Defendant's service with the Ukrainian Auxiliary Police of L'viv, as alleged in paragraphs 13 through 23, constituted membership or participation in a movement hostile to the United States or to the form of government of the United States. Defendant therefore was ineligible to receive a visa under the DPA, and his admission into the United States pursuant thereto was unlawful.

49.  Because Defendant's admission into the United States was unlawful, his subsequent naturalization was unlawful under Section 316(a)(1) of the INA, 8 U.S.C. § 1427(a)(1).

- 13 -

50.  Defendant's citizenship thus was illegally procured and must be revoked, as provided for in Section 340(a) of the INA, 8 U.S.C. § 1451(a).

### COUNT III

Illegal Procurement of U.S. Citizenship:
Unlawful Admission under the Displaced Persons Act
(Willful Misrepresentation)

51.  Plaintiff realleges and incorporates by reference paragraphs 1 through 37, of this Complaint.

52.  As set forh in paragraphs 24 through 33, Defendant entered this country under the provisions of the DPA.

53.  Section 10 of the DPA rendered inadmissible to the United States any alien who willfully misrepresented material facts for the purpose of gaining admission to the United States as an eligible Displaced Person.

54.  Defendant willfully misrepresented material facts for the purpose of gaining admission into the United States when he: (1) sought a determination from the DPC that he was an eligible Displaced Person, as alleged in paragraphs 24 through 27; and (2) sought an immigration visa under the DPA, as alleged in paragraphs 24 through 28.  Defendant was, therefore, ineligible to receive a visa under the DPA.

55.  Because Defendant was not eligible to receive a visa under the DPA, his admission into the United States pursuant thereto was unlawful.

56.  Because Defendant's admission into the United States was unlawful, his subsequent naturalization was unlawful under Section 316(a)(1) of the INA, 8 U.S.C. § 1427(a)(1).

57.  Defendant's citizenship thus was illegally procured and must be revoked, as provided for in Section 340(a) of the INA, 8 U.S.C. § 1451(a).

## COUNT IV

### Illegal Procurement of U.S. Citizenship: Unlawful Admission under State Department Regulations
(Acquiescence in Conduct Contrary
to Civilization and Human Decency)

58.  Plaintiff realleges and incorporates by reference paragraphs 1 through 37 of this Complaint.

59.  At the time that Defendant successfully applied to enter the United States and at the time of his entry into the United States, regulations promulgated by the Department of State pursuant to authority delegated by Presidential proclamation forbade the issuance of a visa to any alien whose entry would be prejudicial to the United States.  The regulations identified those aliens whose entry would be prejudicial to the United States to include:

§ 53.32  Refusal of permission to enter.
(a) No permit to enter shall be issued to any alien if the permit-issuing authority has reason to believe that the entry of the alien would be prejudicial to the interests of the United States.

\*   \*   \*   \*

§ 53.33  Classes of aliens whose entry is deemed to be prejudicial to the public interest.  The entry of an alien who is within one of the following categories shall be deemed to be prejudicial to the interests of the United States . . .

- 15 -

(j) . . . who has advocated or acquiesced in activities or conduct contrary to civilization and human decency on behalf of the Axis countries during . . . [World War II] [or]

(k) . . . who is not within one or more of the classes defined in paragraphs (a) to (j) of this section, but in whose case circumstances of a similar character may be found to exist, which render the alien's admission prejudicial to the interests of the United States . . .

22 C.F.R. §§ 53.32, 53.33 (1949).

60. Defendant's service with the Ukrainian Auxiliary Police in L'viv, as alleged in paragraphs 13 through 23, constituted advocacy and acquiescence in activities or conduct contrary to civilization and human decency, and rendered his admission prejudicial to the interests of the United States, as prohibited by Department of State Regulations. Defendant was therefore ineligible to receive a visa.

61. Because Defendant was not eligible to receive a visa under the State Department regulations, his admission into the United States was unlawful.

62. Because Defendant's admission into the United States was unlawful, his subsequent naturalization was unlawful pursuant to Section 316(a)(1) of the INA, 8 U.S.C. § 1427(a)(1).

63. Defendant's citizenship was thus illegally procured and must be revoked pursuant to Section 340(a) of the INA, 8 U.S.C. § 1451(a).

- 16 -

IV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests:

1.    A declaration that Defendant procured his citizenship and Certificate of Naturalization illegally.

2.    A judgment that revokes the United States citizenship of Defendant, that sets aside the Order of the United States District Court for the Northern District of Illinois dated November 11, 1954, admitting Defendant to citizenship, and cancels Certificate of Naturalization No. 7536855, issued pursuant to that order.

3.    A judgment forever restraining and enjoining Defendant from claiming any rights, privileges, benefits, or advantages under any document evidencing United States citizenship.

4.    A judgment requiring Defendant to surrender immediately and deliver to the Attorney General his Certificate of Naturalization No. 7536855, his United States passport, should he have one, and any other indicia of United States citizenship.

- 17 -

5.    Such other relief as may be lawful and proper.


        Respectfully submitted,


JEFFREY G. COLLINS                ELI M. ROSENBAUM
United States Attorney            Director
for the Eastern District          SUSAN L. SIEGAL
of Michigan                       Principal Deputy Director



L. MICHAEL WICKS                  JEFFREY L. MENKIN
Assistant U.S. Attorney           GREGORY S. GORDON
U.S. Attorney's Office            Senior Trial Attorneys
211 W. Fort Street                Office of Special Investigations
Suite 2001                        Criminal Division
Detroit, Michigan 48226           U.S. Department of Justice
(313) 226-9100                    10th Street & Constitution Ave., NW
                                  John C. Keeney Building, Suite 200
                                  Washington, D.C.  20530
                                  (202) 616-2492
                                  FAX (202) 616-2491



Dated: January 8, 2004