04-60003

Exhibit A

13 pgs.

A

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>JOHN KALYMON,<br>a.k.a.  IVAN/IWAN/JOHN<br>          KALYMON/KALYMUN<br><br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.

# FILED

### JAN 0 8 2004

CLERK'S OFFICE-DETROIT-PSG
U.S. DISTRICT COURT

AFFIDAVIT OF GOOD CAUSE IN SUPPORT OF COMPLAINT

(EXHIBIT A)

Dr. Elizabeth B. White declares under penalty of perjury as follows:

1.  I am the Chief Historian at the Office of Special Investigations, Criminal Division, United States Department of Justice, and, as such, have access to records and information of the U.S. Immigration and Naturalization Service ("INS") as well as other agencies and organizations, regarding the wartime activities, immigration, and naturalization of John Kalymon ("Defendant").  These records and this information form the basis for this affidavit.

-2-

2.    Defendant was born on May 16, 1921, in Komancza (Komantscha), Poland to Teodor and Anastasia (née Suszko) Kalymon.

3.    On August 1, 1941, the Government of Nazi Germany incorporated eastern Galicia, in present day western Ukraine, into the so-called Government General, a territory occupied by the Germans that comprised the central and southern part of prewar Poland.  The new Galician territory, designated District Galicia, was ruled from the city of L'viv, which the Germans called Lemberg.  In August 1941, the German Commander of the Order Police for District Galicia directed the formation of Ukrainian auxiliary police forces ("Ukrainian Auxiliary Police") to aid German occupation authorities in policing District Galicia.

4.    In District Galicia, overall control of security and implementation of anti-Jewish policy, including the mass murder of Jews, belonged to the SS and Police Leader ("SSPF").  Under the SSPF, a senior Gestapo officer oversaw all anti-Jewish measures.

5.    The SS and Police Leader was at the top of a chain of command that extended to the Ukrainian Auxiliary Police.  The members of the Ukrainian Auxiliary Police in L'viv were uniformed, armed, paid a salary, and were given various benefits by German authorities.  Throughout its existence, the Ukrainian

-3-

Auxiliary Police was operationally directed and controlled by Nazi security authorities.

6.    Enforcement of Nazi persecutory policies regarding the Jews and other racial or religious groups in District Galicia was one of the principal responsibilities of German security authorities.  The policy toward the Jews had three components. First, all Jews in the district were confined in ghettos and issued new identification papers that identified them as Jews. Second, all Jews were forcibly removed from the ghetto for subsequent murder either by shooting or gassing.  Third, a limited number of these Jews whom the Germans considered "work capable" were transferred to forced labor camps where many soon died from starvation, disease and other inhumane conditions. Nazi German security authorities depended on the Ukrainian Auxiliary Police in L'viv to implement all three of these components.

7.    The Ukrainian Auxiliary Police in L'viv was organized in "commissariats" (akin to precincts).  Each commissariat was responsible for a geographically defined section of the city and was tasked to enforce German rule, including day-to-day anti-Jewish policies.

8.    As of May 1942, Defendant worked for the 5th Commissariat of the Ukrainian Auxiliary Police in L'viv.  The 5th Commissariat (later renamed the 7th Commissariat) entirely

- 4 -

encompassed the city's Jewish ghetto and had the most active
contact with L'viv's Jewish population.  The precinct was also
contiguous with the northern edge of the Janowska Forced Labor
Camp at the west end of the city.  Defendant served in the
5th/7th Commissariat until at least September 1943.  Sometime
after September 1943, Defendant was transferred to the 4th
Commissariat, where he served until at least March 1944.

9.   On a routine and daily basis, the Ukrainian Auxiliary
Police in L'viv, including the 5th/7th and 4th Commissariats,
enforced the full panoply of Nazi persecutory measures against
the Jews in the city.  Ukrainian auxiliary policemen checked
personal identification documents and arrested Jews lacking
special work passes.  Ukrainian auxiliary policemen also arrested
Jews for failure to wear an armband with the Star of David that
publicly identified them as Jews.  Defendant, as an armed,
uniformed member of the 5th/7th and 4th Commissariats, had the
responsibility to enforce such laws on a day-to-day basis
throughout his tenure in the Ukrainian Auxiliary Police.

10.   The visible, public presence of uniformed, armed
members of the 5th/7th and 4th Commissariats of the Ukrainian
Auxiliary Police provided a conspicuous display of intimidation
in L'viv.  Jews, who saw the uniformed, armed members of the
5th/7th and 4th Commissariats and were aware of their
responsibilities and the abuses they inflicted, lived in fear of

-5-

them.  As a result, the Jews of L'viv more readily submitted to
Nazi anti-Jewish measures.  Defendant, as a uniformed, armed
member of the 5th/7th and 4th Commissariats of the Ukrainian
Auxiliary Police contributed to that public intimidation of the
Jews in L'viv.

11.  In a series of operations conducted between March 1942
and June 1943, more than 100,000 Jews, constituting nearly the
entire Jewish population of L'viv and surrounding areas, were
seized, delivered to a central assembly point, and transported to
killing centers or forced labor camps.  Members of the 5th/7th
Commissariat participated in almost every ghetto reduction
operation.  Defendant was a member of the 5th/7th Commissariat
throughout this period and took part in some or all of those
operations.

12.  On May 11, 1942, after the first significant "ghetto
reduction," Defendant and another Ukrainian auxiliary policeman
were assigned to escort an unknown number of Jews to Pluhovo,
site of an SS-run forced labor camp about forty miles east of
L'viv.  In the course of this transfer operation, Defendant and
the other auxiliary policeman each expended six rounds of
ammunition.

13.  The "Great Operation" in the Jewish ghetto began on
August 10, 1942.  During this ghetto reduction action, the
largest such operation in Galicia during the war, patrols

-6-

composed of Ukrainian auxiliary policemen checked the identity
papers of Jews in the ghetto and swept systematically through the
apartment blocks looking for hiding Jews.  Jews whose documents
attested to employment in a German-sanctioned economic enterprise
were generally left at liberty in the ghetto; Jews who lacked the
necessary authentication stamps or documentation -- the vast
majority of the Jewish population -- were seized and delivered to
the assembly point at the Sobieski School.  During the two-week
operation, approximately 40,000 Jews were "deported," i.e., sent
either to forced labor camps or to the Belzec killing center,
where they were asphyxiated with poison gas.  In addition to
rounding up Jews to be deported during this operation, Ukrainian
auxiliary policemen, including Kalymon, shot to death dozens of
Jews who resisted, fled, or attempted to hide.

          14.   In a report signed by Defendant and dated August 14,
1942, Defendant wrote to his superiors that he "fired four shots
at 7:00 p.m. on 14 August 1942, while serving in the Jewish
operation.  One person was wounded and one was killed."  These
events are confirmed by a summary report filed on the same date
by the commander of the 5th Commissariat.  The report states that
on August 14, 1942, members of the 5th Commissariat delivered
2,128 Jews to a central assembly point.  It also states that,
during that operation, twelve Jews were "killed while escaping"
and another seven Jews were wounded.  Fourteen rounds of

- 7 -

ammunition were expended, four by Kalymon and ten by three other auxiliary policemen of the 5th Commissariat.

15. On August 20, 1942, Defendant along with other auxiliary policemen of the 5th Commissariat, acting in conjunction with the German *Schutzpolizei* [Municipal Police], delivered 525 Jews to the collection point. A total of 14 Jews who attempted to escape or who "offered resistance" were shot and killed, while another six Jews were wounded. Members of the 5th Commissariat expended 49 rounds of ammunition during this operation. Defendant fired two of these rounds.

16. The next day, on August 21, 1942, auxiliary policemen of the 5th Commissariat rounded up and delivered to the assembly point an additional 805 Jews. During the operation, they killed 12 Jews and wounded three. Kalymon fired two rounds of ammunition during this operation.

17. By the end of 1942, L'viv's Jewish population had been reduced to roughly 24,000 from over 100,000 just nine months earlier.

18. Following the "Great Operation," the 5th Commissariat was re-designated the 7th Commissariat. Defendant served in the 7th Commissariat until at least September 1943. In a roster dated July 29, 1943, he is listed as "Guard Commander." Sometime after September 1943, Defendant transferred to the 4th Commissariat, where he remained until at least March 1944.

-8-

19.  In March 1949, Defendant sought a determination from the United States Displaced Persons Commission ("DPC") that he was a Displaced Person as defined in the Displaced Persons Act of 1948, Pub. L. No. 80-774, ch. 647, 62 Stat. 1009 ("DPA"), and was therefore eligible to immigrate to the United States under the DPA.

20.  In connection with his application to the DPC, Defendant misrepresented his employment and residences from 1941 to 1944.  With respect to his residences, he falsely claimed that he was in Kovanca, Poland from 1939 to 1943.  Regarding his employment, he falsely stated: (1) that he was "an employee" in Kovanca, Poland from 1939 to 1943; and (2) attended "Special Driver School" in "Lwow," Poland from 1943 to 1944.

21.  In making these claims, Defendant concealed his service from at least May 1942 until at least March 1944, in the 5th/7th and 4th Commissariats of the Ukrainian Auxiliary Police in L'viv.

22.  Relying upon Defendant's misrepresentations, the DPC determined that Defendant was an eligible Displaced Person.

23.  On or about April 21, 1949, Defendant filed an Application for Immigration Visa and Alien Registration with the American Consulate in Munich, Germany, to obtain an immigrant visa to enter the United States under the DPA.

24.  On his visa application, Defendant misrepresented his residences from 1941 to 1944.  He falsely claimed that, from 1939

-9-

to August 1943, he had resided in "Komantscha," Poland and from August 1943 to July 1944 he resided in Lemberg (i.e. L'viv), Poland. The application gives Defendant's occupation as "shop assistant."

25. On his visa application, Defendant concealed that he arrived in L'viv no later than May 1942. Additionally, Defendant concealed his service from at least May 1942 until at least March 1944 in the 5th/7th and 4th Commissariats of the Ukrainian Auxiliary Police in L'viv.

26. Defendant orally swore to the truth of the information on his visa application.

27. Based on the false information provided by Defendant to U.S. authorities, on or about April 22, 1949, Defendant was issued Immigration Visa No. 6068/53 under the DPA.

28. Defendant used this immigration visa to enter the United States at the Port of New York on or about May 4, 1949.

29. On or about September 15, 1955, Defendant signed and filed a Petition for Naturalization with the United States Immigration and Naturalization Service. He orally swore to the truth of the information he provided therein.

30. On October 11, 1955, the United States District Court for the Northern District of Illinois granted Defendant's Petition for Naturalization and issued to him Certificate of Naturalization No. 7536855.

-10-

31.   There exists good cause for the institution of proceedings against Defendant to revoke and set aside the order admitting Defendant to naturalization and to cancel his Certificate of Naturalization, pursuant to Section 340(a) of the Immigration and Nationality Act, 8 U.S.C. § 1451(a), because Defendant illegally procured his admission into this country and his naturalization.

32.   Defendant resides at 1539 Devonshire Drive, Troy, Michigan, 48098.

### DECLARATION IN LIEU OF JURAT

### (28 U.S.C. § 1746)

I declare under penalty of perjury that the foregoing is true and correct.   Executed this _6th_ day of January, 2004.

Dr. Elizabeth B. White
Chief Historian
Criminal Division
Office of Special Investigations
United States Department of Justice
John C. Keeney Building
10th & Constitution Ave., NW
Suite 200
Washington, D.C. 20530
(202)616-2492

JS 44 (Rev. 3/99)   **CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
United States of America

04 - 60003

**DEFENDANTS**
John Kalymon
a.k.a. Ivan/Iwan/John
Kalymon/Kalymun

(b) County of Residence of First Listed Plaintiff    38888
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed    Oakland
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney'S (Firm Name, Address, and Telephone Number)
Gregory S. Gordon, Office of Special Investigations - DOJ
10th St. & Constitution Ave. NW
John C. Keeney Bldg., Ste. 200, Washington, D.C. 20530
(202) 616-2492

Attorneys (If Known)
Andrew J. Haliw  JUDGE MARIANNE O. BATTANI
37000 Grand River Ave., Ste. 350   Mazzoub
Farmington Hills, MI 48335

### II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

☒ 1 U.S. Government Plaintiff
☐ 2 U.S Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PLF | DEF |  | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans (Excl. | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 730 Labor/Mgmt. Reporting | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | ☐ 791 Empl. Ret. Inc. | or Defendant) | Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Security Act | ☐ 871 IRS – Third Party | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | 26 USC 7609 | ☐ 950 Constitutionality of State |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | Statutes |
| | | ☐ 550 Civil Rights | | | ☒ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

### V. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Section 340(a) of the Immigration & Nationality Act of 1952, 8 U.S.C. Section 1451(a). Action to revoke citizenship of defendant.

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

### VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE
DOCKET NUMBER

DATE  1/8/04

SIGNATURE OF ATTORNEY OF RECORD
Gregory S. Gordon xmu

FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

This form was electronically produced by Elite Federal Forms, Inc.

# PURSUANT TO LOCAL RULE 83.11

1.   Is this a case that has been previously discontinued or dismissed?     ❑ YES ☒ NO

    If yes, give the following information:

    Court: _____

    Case No.: _____

    Judge: _____

2.   Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)     ❑ YES ☒ NO

    If yes, give the following information:

    Court: _____

    Case No.: _____

    Judge: _____

NOTES: