**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,            No. 04-60003

  v.                        HON. MARIANNE O. BATTANI

JOHN KAYMON, a.k.a. IVAN,
IWAN, JOHN
KALYMON/KAYLMUN,

        Defendant.

_____/

**OPINION AND ORDER REVOKING ORDER OF ADMISSION TO**
**CITIZENSHIP AND CANCELING CERTIFICATE OF NATURALIZATION**

      This matter came before the Court for a bench trial on September 15, 2006, and was concluded on September 25, 2006. The Court heard testimony from Dr. Dieter Pohl, expert historian, Dr. Antonio Cantu, an ink and paper examiner, Defendant John Kalymon, and his wife, Lubow Kalymon. The Court also received and reviewed the deposition testimony of William Arket, Mario DeCapua, and William Smith, who testified about the administration of applications under the Displaced Persons Act of 1948 ("DPA"), Pub. L. No. 80-774, ch. 647, 62 Stat. 1009, and issuance of immigrant visas for entry into the United States. Finally, the Court received the deposition testimony of Roman Okpysh, a former employee of the Ukranian Auxiliary Police, who worked in L'viv during World War II. The Court received numerous documents, including P1-P18, P20-30, P34-44, P46-55, P58-89, 91-98, P100-130, P138-153, P155-162, 166-171, PR1, D1-48, D46, D52, D50, D62, and D95.

      The Court, having considered the evidence submitted and the legal arguments of the parties, enters the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a).

## I. INTRODUCTION

The Government seeks the revocation of the 1955 order admitting Defendant, John Kalymon, to citizenship and cancellation of the certificate of naturalization issued to him, based upon Defendant's service from October 1941, through at least March 1944, in the Nazi-sponsored Ukrainian Auxiliary Police ("UAP"). This Court has jurisdiction to resolve this case pursuant to 28 U.S.C. § 1345 (providing district courts with original jurisdiction for civil actions brought by the United States) and 8 U.S.C. § 1451(a) (providing district courts with original jurisdiction for denaturalization actions and establishing venue in district where defendant resides).

In the Complaint, filed January 8, 2004, the Government alleges that Defendant's citizenship was illegally procured, and therefore must be revoked under Section 340(a) of the Immigration and Naturalization Act of 1952 ("INA"), 8 U.S.C. § 1451(a), because he was not "lawfully admitted for permanent residence" to the United States as required by Section 316(a) of the INA, 8 U.S.C. § 1427(a). The Government advances four grounds for denaturalization. First, it contends that Defendant's service and activities as an armed Ukrainian Auxiliary policeman in Nazi-occupied L'viv, in what now is Ukraine, included enforcement of Nazi ideologically-based persecutory measures against those whom the Nazis deemed dangerous or undesirable because of their race, religion, national origin, or political belief, especially the Jews of L'viv. The Government concludes that Kalymon's service constituted assistance in the persecution of civilians, rendering him ineligible for a visa under Section 2(b) of the DPA (Count I). Second, the Government alleges that Defendant's service in the Nazi-sponsored Ukranian Auxiliary Police ("UAP") constituted membership or participation in a movement hostile to the United States, rendering him ineligible for a visa under Section 13 of the DPA (Count II). Third, the Government asserts that Defendant willfully misrepresented his wartime service in the UAP to obtain a DPA visa, rendering him ineligible for a visa under Section 10 of the DPA (Count III). Fourth, the

2

Government claims that by performing the duties of a Ukrainian Auxiliary policeman, Defendant "advocated or acquiesced in activities or conduct contrary to civilization and human decency," rendering him ineligible for a visa under State Department regulations in effect at the time he applied for entry to the United States (Count IV).

Defendant contests all charges.

## II.  BACKGROUND

The stipulated facts establish Mr. Kalymon's background, his service in the UAP, and his immigration to the United States.  The stipulated facts also provide the backdrop of the Nazi occupation of L'viv, and establish the treatment of the Jewish population in L'Viv during the Nazi occupation.  The Court's findings of facts are based not only on the stipulated facts, but also on the testimony and documents received at trial.

Because the Court received almost 200 exhibits, it limits its discussion to those exhibits most compelling to its findings.  The government's first witness, Dr. Dieter Pohl, Senior Historian with the Institute of Contemporary History in Munich, Germany, a state-funded research institute, authenticated the wartime documents and placed them in their historical context.  Dr. Pohl specializes in the Second World War, especially Nazi occupation policy and war crimes, and to a certain extent, on the post-war period of Communism." Tr. at 51.  Dr. Pohl's knowledge of the documents and events that occurred during the relevant timeframe as well as the context and meaning of the documents greatly assisted this Court in reaching its decision on the troubling issues before it.

## III.  FINDINGS OF FACTS

Defendant was born on May 16, 1921, in Komancza (Komantscha), Poland, to Teodor Kalymon and Anastasia (nee Suszko) Kalymon.  Stipulated Facts ("SF") 1, 2.  Mr. Kalymun's father died when he was a child, and his brother, Stepan, who was involved in the Polish resistance, was killed during World War II.  Tr. at 757.

Mr. Kalymon attended school through the seventh (7th) grade, in Poland.  SF 3. He left Poland in 1939, and went to Bomblitz, Germany, where he worked in a sausage casing factory.  Tr. 652-53.   He went to L'viv in late 1941.  Id. at 677-79.  When Mr. Kalymon arrived, he was a stranger in L'viv.  He knew no one.  He lived in a homeless shelter while searching for work.  Tr. at 716.  He eventually found employment as a police private in the Ukranian Auxiliary Police, also known as the Ukrainian Police out of "necessity to survive."  Tr. at 653.

### A.  Conditions in the District of Galacia

Nazi Germany invaded Soviet Union territory in June 1941, SF 4, to create a "Lebestraum" or living space, in which it intended to install a new racial order. Tr. at 69. "Jews were at the bottom of the [racial order] hierarchy."  Tr. at 80.  The "general ideological belief held by the Nazi party was that the Jews were dangerous and pernicious to the German Regime." Id.

"When the  Nazis invaded in June 1941, there were approximately 4.8 million inhabitants in the District of Galacia.  Tr. at 70.  "The majority of those were Ukraines who predominantly lived in the countryside; and second came the Poles, [who] predominantly lived in the cities; and third were the approximately 540,000 Jews, [who] also predominantly lived in the cities and towns."  Id.  Under Soviet rule, Ukrainians had been conscripted into the Red Army, and millions died as a result of Soviet policy.  Tr. at 414.

The transition from Soviet occupation to Nazi occupation was not seamless.  In late June, 1941, during the transition period, the Soviets suppressed an uprising by the Ukrainian independence movement.  P1.  Before the Soviets finally retreated, they committed mass murders of the intelligentsia, executed political prisoners, including Lubow Kalymon's father, a Greek Catholic priest, and set the prisons on fire.  Tr. at 427, 752.  The following summer there were food shortages.  Tr. at 536.  Forced deportation and resettlement of Ukrainians for service in the Reich was rumored and actually did occur.  Id.

4

On August 1, 1941, Nazi Germany incorporated eastern Galicia into the so-called Government General, a territory comprising the central and southern part of what had a been prewar Poland.  SF 4.  The new Galician territory, designated "District Galicia," was ruled from the city of L'viv (L'vov, Lwow), which the Germans called Lemberg.  Id.  Tr. at 439.  NonGermans had no role in government; however, they comprised the majority of personnel.  The locals were "completely subordinate to the German Occupiers."  Tr. at 94.

Upon their arrival, the Germans made use of indigenous forces to promote their ideology.[1]  Dr. Pohl testified that Germans promoted spontaneous anti-Jewish violence.  Tr. at 80.  See P2  ( "No obstacles should be placed in the way of self-cleansing efforts in anti-Communist or anti-Jewish circles in the territories to be newly occupied.").  One of the first steps taken in L'viv to effectuate the ideology was to isolate Jews from the nonJewish population.  Tr. 95, 89.  The second step was isolation of Jews from their property, and the third was to prepare them, or to have them prepared, for deportation.  Id.  Some overlap of the steps occurred.  Id.  When asked whether the primary tool used to keep order in the Government General in Galicia was fear, Dr. Pohl responded: "That depends on the definition of order, because order in the German sense, which at that point was highly ideological racist, meant racial order used for suppression of the Jews, for example, and other things, and, of course, in that respect, fear was a primary tool of the occupation regime."  Tr. at 535.  The Civil Administration also made use of the media.  It included a Propaganda Section that used publications and the newspapers to promote the Nazi ideology.  Tr. at 478-79.

In sum, from the outset, the Nazi occupation forces enacted a series of race-based persecutory policies against the civilian population of District Galicia, SF 5, particularly the

---

[1]"Anti-Semitic sentiment existed among the Ukrainians," Tr. at 470-71, and when the Nazis took control, "there were thousands of denunciations of Jews to German officers, at least until the March operation, then this declined a little bit when the Ukrainians and the Poles realized that the Jews were killed en masse."  Tr. at 437.

Jews. Nazi persecutory policy toward the Jews in District Galicia included 1) confining all Jews in ghettos and issuing new identification papers that identified them as Jews; 2) forcibly removing Jews from the ghetto for subsequent murder either by shooting or gassing; and 3) sparing a limited number of Jews whom the Germans considered "work capable" until they were transferred to forced labor camps where many died from starvation, disease and other inhumane conditions. Id. The details of each step are set forth below.

### 1. Isolation

Although the Civil Administration had harsh policies against all foreigners, Jews were singled out for the harshest treatment. An official document defining the concept of Jew was promulgated in August 1941. See P3. It was followed with an August 26, 1941, order that "All Jewish men and women residing in Galicia, District of Galicia, who are older than ten are obligated to wear an armband at least ten centimeters wide with a clearly visible eight centimeter star of David on the right arm of their clothing and outerwear." P4. The effective date of the order was delayed to September 15, 1941. P5. Fines were established for failure to comply. Id. Jews were given an earlier curfew, (P6), more severe trading restrictions (P7), and only one-half of the quantities of food distributions issued to the general population (P8). NonJews had to work, but Jews had to fulfill forced labor. Tr. at 81

### 2. Ghettoization

The isolation policies were quickly followed by the Governor of the District of Galicia's November 10, 1941, announcement of the creation of a Jewish Sector in L'viv. P9. Consequently, all Jews living in L'viv were ordered to move to a newly-created Jewish ghetto north of the city center. SF 10. The operation was suspended in December and resumed in Spring 1942. Id.

During this ghettoization process, German police screened Jews moving into the quarter for personal valuables, which were seized.  Id.  Tr. at 89-92.  The German Police also selected the infirm and elderly for immediate "resettlement," a Nazi euphemism for murder.  Id.  Those Jews selected were sent to a nearby forest and shot.  Tr. at 179-80.  Approximately 50,000 Jews were moved to the Ghetto, and between 5000 and 6000 were shot.  Id., P55.

Ukrainians and Poles living in the designated sector were required to leave before December 14, 1941.  Id.  Jews were permitted to take only their "personal absolutely essential goods and equipment," id. at ¶ V, whereas Poles and Ukrainians were free to take all their possessions.  Jews were permitted to enter and leave the residential sector only in designated areas, which were different that the egress designated for nonJews.  Id.

After December 14, 1941, only Jews were allowed to enter the Jewish residential sector.  The Jewish Council, or Judenrat, was responsible for ensuring orderly resettlement.  Id.; Tr. at 187.  Jews leaving the sector assigned to them without permission could "be punished by death. . .as [could] persons who knowingly provide[d] protection for Jews."  P9, P28.  The documents show that, at a minimum, nonJews were arrested and detained for hiding Jews.  P28.

Jews employed in businesses related to the military economy were excepted, and a district for Jews who worked as craftsmen or skilled workers was created outside the ghetto.  P10, P11.  Around 20,000 skilled laborers lived outside the ghetto.  Tr. at 100.  A June 30, 1943, Report by Katzmann, the SS and police leader in the District, explains that "[b]ecause of the peculiar circumstances that 90 percent of the craftsmen in Galicia were Jewish. . .immediate removal would not have been in the interest of the war economy."  P11, P58, Tr. at 185.

German security forces in L'viv began the reduction of the ghetto's population in a series of actions in March 1942, even as the ghetto was itself still being consolidated.  SF

7

11.   In preparation of the March Operation, several policies were enacted.   Worker identification cards with photos were required to facilitate presorting.  Tr. at 189-90, P60. Jews wearing "A" armbands included those deemed indispensable to the war economy. Those given "B" armbands were deemed capable of work; those with "C" armbands were incapable of work, and the first to be "deported."  Tr. at 190.

The March Operation involved two stages.  Tr. at 189.  In the first, German and Ukranian police and the Jewish Order Service went through the ghetto and arrested those people to be resettled.   "Jews without residences, unemployed persons and welfare recipients, the so-called anti-social elements" were identified.  P63.  Those deported were permitted to bring "200 Zlotys, 25 kilograms of luggage and provisions" in order to hide the true purpose.  P63, Tr. at 196.  It subsequently became clear that resettled/deported meant exterminated.  Id. at 192, P61.

German municipal police and Ukrainian Police, including the 5th Commissariat, conducted the second stage more forcefully.   Id.  P64-P69, P71-78 Tr. 188-89, 194-95, 201-06.  Jews were first collected at Sobieski School, then transferred to a railhead on the edge of the city.  P63.  German city police and Ukrainian police guarded the school.  Tr. at 193, P64.  Most of the people collected were sent by train for "labor deployment in the East."   In reality, they were sent to the gas chambers of Belzec extermination center, outside of L'Viv.  Tr. 188-89, 192-96, P61, P62, P63.  After about four days, the SS took over the March operation to correct the inefficiencies attributed to the municipal police. Employers were allowed to undermine the stated goal to deport one thousand Jews each day because hundreds of Jews were released to employers at the school.  Accordingly, the awaiting box cars were not filled to capacity.  Id. at 197, P62, 63.  Eye witness testimony revealed that treatment at the school was brutal.  Jews were beaten, humiliated and spat upon.  P63.  As Jews lined up and boarded the awaiting transport, police beat them with sticks and rubber truncheons.  Id.  Approximately 20% died during transport.  At the

conclusion of the March Operation, approximately 15,000 Jews were deported. P66, P67, P72.

A follow-up report on transgressions committed during the March Operation confirms that Jews were abused for no reason, and work registration certificates were destroyed. P70. As a consequence, UAP employees were ordered to receive instruction on the prohibited actions, id., which they did. See P71. The records also show that Jews attempted to hide during the March Operation, P74, and attempted to buy their freedom, P75, P76, P78, and that panic spread through the Ghetto during that time. After the March operation, Germans and Ukrainians were reported to have become the worst enemies of the Jews. P21.

Another round-up of Jews took place in L'viv on June 24-25, 1942. SF 15. Approximately 1,000 Jews were sent to Janowska Forced Labor Camp or were "resettled" locally, i.e., shot in the forest outside the city. P86-89, Tr. at 235-36. The 5th Commissariat participated in the June 1942 round-up. P86, P87, Tr. at 236-42, 256-58.

In August 1942, German authorities began the largest ghetto reduction action against the residents of the L'viv Jewish ghetto, an action commonly known as the "Great Operation." SF 14. The Great Operation occurred shortly after the July 19, 1942, superior order for the August action was issued by the Chief of the German Police and SS, Heinrich Himmler. Himmler demanded a "total cleansing" of the Jewish population. He directed " that the resettlement of the entire Jewish population of the Government General be carried out and completed by 31 December 1942. Effective 31 December 1942, no more persons of Jewish ancestry are permitted to be in the Government General." P92, Tr. at 246.

Brigadeführer Katzmman subsequently issued a follow-up announcement "that within half a year there will no longer be any free Jews in the Government General." P93. He wrote, "The Jews living scattered in the countryside are being killed by individual details. Some of the Jews concentrated in the cities are being liquidated in large-scale operations.

Some are being deported, and some are being collected in labor camps." Id.  Dr. Pohl commented on this document, which unlike so many others, "so openly speak[s] about what the Germans did."  Tr. at 246.  He added, "Generally, in this kind of document, you have euphemistic language, like resettlement or cleansing or whatever, and in this document, the main perpetrator in the area said, we will kill the Jews, openly, and that's one of the reasons why [the document is] secret."  Id.

The reduction began August 10, 1942,  and continued through August 23, 1942.  Tr. at 246.  German security personnel and Ukranian Auxiliary policemen checked the identity papers of Jews throughout the city.  P94.  Jews with documents attesting to employment in a German-sanctioned industrial enterprise were not seized.   Jews without such papers were delivered to an assembly point in the city center to await "resettlement."  "The number of captured Jews and the use of weapons or of bribery [were] reported to the Ukrainian Police Headquarters in L'viv every two hours," because quotas had to be met.  Quotas were important because "[t]he whole deportation was organized in such fashion that the first thing the perpetrators had to do was to order a freight train with a selected number of box cars, and that. . .determined the daily quota. . .they had to fill the train, more or less. That's why they set the quota up.  And if they realized at a certain stage during the day that the quota won't be filled, they would apply pressure on their subordinates to arrest more Jews."  Tr. at 247-48.

The Ukrainian police prepared for the Great Operation in advance of the clearance. For example, they put up sentry posts at the main roads leaving L'Viv to prevent escape. Id. at 249-50, P94-98.

During the March Operation, the UAP escorted Jews from the assembly point to the railhead or Janowski Forced Labor Camp, provided search teams to clear Jews from apartments, escorted Jews between processing points, guarded Jews held at various assembly points, and manned the cordon duty posts to prevent Jews from escaping. The

10

UAP seized and delivered at least 18,000 Jews.  P91, P93, P94, P98, P100, P11, P106, P109, P110, P115, P117, P119, P123, P125, P128-130. Tr. at 243-54, 259-332.  Resistors and those who hid or fled were shot by the UAP.  At the end of the Great Operation, the Jewish population of L'viv went from 100,000 to 35,000.  P42, P91, Tr. at 331, 353.

The Jewish ghetto, which became known as the Jewish camp (Julag), was liquidated in June 1943.  The remaining Jews were shot or transferred to forced labor camps.  Tr. at 364.

**B.  The Ukrainian Auxiliary Police**

Relying on the wartime documentation, Dr. Pohl testified about the origin, the formation, function, and operation of the Ukrainian Auxiliary Police during the Nazi occupation of L'viv.  In forming his opinions, he relied on original documentation, particularly that found at "the L'viv State Regional Archive, [which] has the biggest collection of documents created by the Ukrainian Auxiliary Police."  Id.  Dr. Pohl testified that only a fraction of the records survived because many were burned at the end of the war.  Tr. 131.

The occupying German Reich, through the Order Police, established the Ukrainian Auxiliary Police in L'viv.  Tr. at 96, P12 (founding document), P13 (authorizing expenditures for wages, salaries, quarters), P14, P15.  The Order Police was the general German police as opposed to the Security Police, which was the ordinary criminal police, and the political or secret state police, the German Gestapo.  Tr. at 95, 399.  It fulfilled the task of maintaining public order and constituted the majority of German police personnel.  Id.  The UAP was subordinate to the command of the German Order Police.  P20.  The UAP was divided into "commissariats" (analogous to modern-day precincts).  See P54 (map of 5th Commissariat). Each commissariat was responsible for a geographically defined section of the city.

Begging and black-marketeering unlicenced trade created a need for additional police officers, P17, and the UAP's identified function was assistance with constabulary police functions. P19, Tr. 401-03. The founding documents show that it was established "to maintain public peace, order and security" in the city of L'viv–mainly through the guard duty (posts and patrols), which, in general, consisted of the street duty and the duty in guardrooms of the Commissariats and Police Stations. Policemen were also available for use as "guards or jailers." P44. "The only duty of the Ukrainian police [was] to ensure peace and order." D58. Its function was prevention of "all looting and other excesses" and reporting such occurrences "to the nearest two headquarters." Id. Police were recruited; they were never conscripted or drafted. Tr. at 124.

The UAP was poorly supplied. Records from March 1942, show newly recruited policemen had no uniforms, and pistols were needed. P 21; P22 (July 1943 Recruitment for the UAP). Eventually, employees of the UAP in L'viv were uniformed, armed, and paid a salary. They received other benefits such as potatoes, firewood, brandy and butter. Tr. at 149. Leave was available. P18, P31, P34, P35, P36, P37.

Dr. Pohl testified that each policeman had a personnel file, and that the personnel file of Tymisz Sasiak, who was employed as a police private from 1942-44, was representative. Tr. 130. The file reveals that UAP candidates were asked about Jewish ancestry, and were required to make declarations about Aryan descent. P23. Candidates took loyalty oaths to the German administration. Id. Training lasted a month, P37; Tr. at 138, and included exercise, marching, and German instruction. See P25 (pistol training had not been completed in July 1942), P26, P29. Training also included ideological instruction, P23, which generally included "[t]eaching about the German Reich and it's

12

wonderful Führer, Adolf Hitler, about the racial structure, and also about the Jews.[2]  Tr. at 463.

Rules governed the issuance of weapons:  Each Commissariat of the Ukrainian Police (Police Station) maintain[ed] a register, upon which it would be possible to verify at any time the issuance and return of the revolvers, and munitions, as well as use of any munitions.  One weapon per two men was shared from shift to shift.  Tr. at 443.  See P15 (showing the formula for distribution of weapons not to exceed 50 percent of the personnel count).  On each relief of the duty, the duty officers of sections "A" and "B" turned over the weapons assigned to the Commissariat.  In each such turnover, corresponding notes in the register confirmed "that the revolvers and munitions were fully transferred in serviceable and clean condition."  Id.  See also D44.  Members of the Ukrainian Auxiliary Police were prohibited from obtaining any weapons from captured inventories or approaching officers of the Wehrmacht in order to obtain weapons."  Tr. 467.

The records show that ammunition likewise was controlled tightly.  P15 (limited ammunition to 20 rounds per weapon), P16.  The concern over supplies of ammunition continued throughout the occupation.  A September 5, 1942, Report on the Great Operation shows that "a strikingly large amount of pistol ammunition has been used. . . "regarding Jewish resettlement."  "The difficulty of replacing this ammunition makes it impossible to distribute replacement ammunition in the foreseeable future.  If it appears necessary in such operations to use firearms to prevent escape attempts or break resistance, the carbine or rifle should be used instead if the situation allows."  P91.

Moreover, possession of ammunition by a citizen was punishable by death.  Tr. at 467.  Although Dr. Pohl conceded that a black market typically grows around contraband, he saw no evidence of a black market for weapons and ammunition in the documents he

---

[2]Ideological training was also imposed on the entire population by the occupying power as a part of their lives, the lives of their children. Tr. at 463.

studied.  Id. at 444-45.  He further acknowledged that because an active resistence movement existed in Galicia,[3] illegal weapons trading probably existed, and such matters would have been very secret.  Id. at 445.

The documents reflect that Ukrainian policemen did perform regular constabulary duties for which the UAP was formed.  Dr. Pohl noted that "in general, all Ukrainian policemen had to fulfill the general duties which were outlined in the different regulations." Tr. 520-23.  The UAP never had sufficient manpower to carry out its assigned responsibilities so, although there was some limited distribution of work, in general, all Ukrainian policemen had to fulfill the general duties which were outlined in the different regulations and the anti-Jewish operations. Tr. 520-23.  The UAP routinely enforced persecutory measures against the Jewish population, Tr. at 160, including control of the black market, armbands P40, curfews, P21, and cleanliness violations.[4]  Id. and 162.

UAP duties were not limited to areas outside the ghetto or unrelated to the so-called operations.  The documents show that the UAP performed "extraordinary" duties with regard to the ghetto.  They took part in sweeps during reduction actions, manned cordon posts around the city to prevent Jews from escaping, escorted and guarded Jews at and between assembly points, and searched for Jew who attempted to hide or flee.  Tr. 251, 522, 582; P64, P70, P94-97.   The Ukrainian police participated in the anti-Jewish operations in March '42, August '42, November '42, March, '43, June '43, and November '43.  P17; Tr. 162, 328-31, 522, 582, 667, 685.

---

[3]Early resistence was limited to Poles; however, in the Spring of 1943, the National Ukrainian Resistence Movement became active and in the Summer of 1943, Soviet partisans entered Eastern Galicia.  Id. at 445-46.

[4]Cleanliness violations arose out of fear that disease from the ghetto would spread to other quarters of the city and affect even the personnel of the German Occupation.  Tr. at 187.

14

### C.  Kalymon's service in the UAP

Mr. Kalymon admits serving in the Fifth, Seventh and Fourth Commissariats; however he testified that he acted as a peacekeeper, never possessed or fired a pistol during his service, and that he had no knowledge of or contact with the Jewish population of L'viv.  Roman Okpysh likewise testified that the UAP did not assist the Nazi occupation authorities in enforcing anti-Jewish laws.  Because Mr. Okpysh served with the UAP in 1943, after the extermination of the Jews in L'viv, the Court finds his testimony of no material value in resolving the Defendant's conduct during his employment.

Because the exhibits relied upon by the Government to show Defendant's employment and activities contain variations on the spelling of his first and surnames, the Court must first determine whether the documents refer to Defendant.  Numerous wartime documents of the UAP that were admitted into evidence identify "Ivan/Iwan/Jan" "Kalymun/ Kalymon" as a Ukrainian Auxiliary policeman.  Further, the parties have stipulated that as of May 1942, Defendant worked for the 5th Commissariat of the Ukrainian Auxiliary Police in L'viv; that around May 1943, the 5th Commissariat was predesignated the 7th Commissariat; that Defendant thereafter served in the 7th Commissariat until at least September 1943; and that sometime after September 1943, Defendant was transferred to the 4th Commissariat of the UAP in L'viv, where he worked until at least March 1944.  SF 15.  In determining whether the documents indeed refer to Defendant, the Court considers not only the testimony of Defendant, but the stipulations and testimony of Dr. Pohl as well.

Any variations in the spelling of Defendant's first name on these documents is easily explained.  First, Defendant admits that "Ivan" is the equivalent of "Iwan" and "Jan."  Second, Dr. Pohl testified that documents completed in the German language would account for the use of Iwan, whereas in Cyrillic, the name would be Ivan.  Tr. at 493-94.  Jan is merely the Polish equivalent.  Id.

15

The language difference does not account for the two spellings of the surname.  Tr. at 494.   Defendant's birth record, P50, identifies his surname as "Kalymun."  Although Defendant admitted that he has utilized both spellings of his surname, *i.e.*, "Kalymun" and "Kalymon," he claims that he used Kalymon exclusively after he left Germany in 1941.

The Kalymon spelling appears in many of the more innocuous documents: P157 (salary declaration), D46 (list of policemen receiving fabric for uniforms), P159 and P160 (registration forms), P161 (driver's license), P53 (list of policemen receiving underwear), P84(list for potato cards), P85 (requirements for butter), P148 (certificate for support fund), P139 (payroll), P140 (brandy and cigarette distribution), P141 and P142 (firewood lists), P143 and P144 (lists for potatoes), P145 (policemen identified for shooting practice), P148 (candidates), P153 (list of Group A, 7th Commissariat).

In contrast, in each document concerning the use of ammunition, the last name is spelled Kalymun.   See P82 (Chief of Commissariat memo re: use of ammunition during the Pluhov transport), P111 (Commissariat Chief's report on use of ammunition on August 14, 1942, during Jewish Operation), P112 (report by Vistun Iv Kalymun), P124 (memo from the Chief of the Commissariat regarding the Jewish Operation on August 20, 1942, in which he reports that Kalymun expended two rounds of ammunition).

The Court attributes all the documents referencing Ivan or Iwan Kalymon or Kalymun to account for Defendant for several reasons.  Mr. Kalymon testified that he knew of no other policeman with the last name Kalymon or Kalymun, while he served in the UAP.  Dr. Pohl testified that the documents show three with the name Kalymon:  Roman; Stefan; and Ivan.  There is no evidence to suggest the existence of an employee with the surname Kalymon.  Moreover, P48, which utilizes the spelling "Kalymun," bears Defendant's admitted date and place of birth.

In addition, Defendant has admitted that he served in the 5th, 7th, and 4th Commissariats of the UAP in L'viv during the period that a person bearing the name

16

"Ivan/Iwan" "Kalymun/Kalymon" served in these same units.  The absence of any record that another person bearing the name "Ivan/Iwan" "Kalymun/Kalymon," with the same date and place of birth as Defendant, served in the UAP between May 1942 and March 1944, in the same commissariats as Defendant, confirms that all of the documents refer to John Kalymon.[5]

The Court next considers Defendant's assertions that he never possessed or fired a pistol and never received ideological training.  When discussing a particular document below, the Court will use the spelling of the surname that appears in the document.

Although no documents exist logging a pistol to Mr. Kalymon, Tr. at 513, and no record exists showing he received ideological training, id., at 720, the Court nevertheless finds that policemen serving in the UAP did use pistols and receive training in Nazi ideology.  As for pistol training, there is reference to pistols and/or revolvers in many of the documents as well as lists of policemen selected for training.  Many documents did not survive the war, and the absence of a list selecting Defendant for training does give the Court pause.  Likewise, the absence of Defendant's personnel file means the extent of ideological training given to Mr. Kalymon is unknown, and the Court makes no finding as to Defendant's commitment to that ideology.  Nevertheless, Dr. Pohl testified credibly that ideological or doctrinal training was required for UAP personnel and the entire Ukrainian population.  In addition, an oath of allegiance to the occupying German Reich was required

---

[5] Minor variations in the renditions of a defendant's Ukrainian surname on wartime documents consistently have been found to be irrelevant when other identifying information (e.g., date and place of birth) has matched that of the defendant's.  See, e.g., United States v. Mandycz, 359 F. Supp. 2d 601, 608-09 (E.D. Mich. 2005) (Mandycz's Ukrainian surname spelled on wartime rosters as "Manditsch," "Manntitsch," and "Mandytsch"), aff'd, 447 F.3d 951 (6th Cir. 2006); United States v. Demjanjuk, No. 99CV1193, 2002 WL 544622 at *6-9 (N.D. Ohio Feb. 21, 2002) (Demjanjuk's Ukrainian surname spelled on rosters as "Deminjuk," "Demianjuk," "Demianiuk," and "Demenjuk") (Attachment 1), aff'd, 367 F.3d 623 (6th Cir.), cert. denied, 543 U.S. 970 (2004).

for most positions controlled by the Germans in Ukraine, even if the precise terms and conditions are not documented.  Tr. at 130.

Mr. Kalymon testified that he never participated in the rounding up or transportation of Jews from the ghetto.  The documents contradict his assertion.  Several documents specifically reference Defendant's police activities.  On May 6, 1942, Iv Kalymun generated a cleanliness inspection report, in which he reported nonconforming properties.  P80.

On May 11, 1942, Ivan Kalymun and another policeman were assigned to escort an unknown number of Jews to Pluvhov, the location of a SS-run, forced labor camp.  Defendant and the other auxiliary policeman each expended six rounds of ammunition.  P82; Tr. at 232-35.  German Order police accompanied the UAP privates, and Dr. Pohl agreed that Vistun (private) Kalymun acted on the direct command of two Reich Germans, but contested Defendant's counsel's contention that the UAP privates had no option to disobey orders given by the Order police.  Dr. Pohl testified that no credible evidence existed that ignoring an officer would result in being shot.  Tr. at 519-20.  According to Dr. Pohl, "This question of following orders has been investigated over the last 60 years, because it's so important.  In the German case, in the purely German case, it's quite clear that there were no specific harsh consequences if somebody did not obey such an order.  In the case of the German giving a foreign auxiliary, which was very often the case all over Europe, such an order, the situation is different.  But it is never a situation of "you fire or I fire at you."  It's just a disobedience of order which will be punished according to disciplinary measures.  He might be fired from the police, have some days of arrest."  Tr. at 520-22.

In a report dated August 14, 1942, Iv Kalymun recorded that he fired four shots while on duty at 7:00 p.m. on August 14, 1942.  P112.  One person was wounded and one was killed.  Id., Tr. at 291-92.  A summary report filed on the same date by the Chief of the 5th Commissariat stated that members of the 5th Commissariat delivered 2,128 Jews to a

18

central assembly point and that during the operation, twelve Jews were "killed while escaping" and another seven Jews were wounded. The report states that fourteen rounds of ammunition were expended, including four by Ivan Kalymun. P111, Tr. at 291-95.

Next, Defendant denies that his signature appears on P112. Tr. at 686. Although no handwriting expert testified in this case, Dr. Antonio Cantu of the United States Secret Service testified that he examined P111 and P112, the two reports dated August 14, 1942, which state that Ivan Kalymun of the Fifth Commissariat shot at Jews during the ghetto clearance operation. Cantu testified that these reports are completely consistent with documents produced during that period.

On August 20, 1942, Defendant and other policemen and the German Schultzpolzei (Municipal Police) delivered 525 Jews to an assembly point. Fourteen Jews, who either attempted escape or offered resistance, were shot and killed. Six Jews were wounded. Kalymun fired two of the 49 rounds of ammunition used during the operations. P124, Tr. at 314-15. The following day, August 21, 1942, policemen rounded up and delivered an additional 805 Jews. Twelve Jews were killed, and three wounded. Ivan Kalymun fired two rounds of ammunition during this operation. P 126, Tr. at 318-19.

In sum, the evidence shows that three major ghetto reductions occurred in March 1942, June 1942, and August 1942. By the end of 1942, the Jewish population of L'viv was reduced from 100,000 to approximately 35,000. In June 1943, the UAP assisted in the liquidation of the Jewish ghetto. Residents were shot or transferred to forced labor camps. Defendant worked in the 7th Commissariat during the time that it participated in the liquidation of the Julag. P151. A small number of Jews survived by hiding in the ruins of the ghetto. SF 8, P151, P152, Tr. at 354-68.

From November 19 through 23, 1943, the UAP participated in a massive search operation to locate any remaining Jews and turn them over to German authorities. From Nov. 19 through the 23, 1943, all UAP in L'viv, including those assigned to the 4th

19

Commissariat, were ordered into the city streets for a search and cordon operation to locates Jews in hiding.  UAP manned roadblocks and patrolled the streets to screen any person attempting to leave the city.  UAP personnel escorted Jews to the commissariat building, where they were turned over to German authorities.  P151, Tr. at 368-71. Defendant was assigned to the 4th Commissariat during this time period.

In 1944, Defendant married his wife, Lubow.  Sometime after March 1944, Defendant resigned from the UAP "to pursue other economic interests."  SF 17.

### D.  Defendant's Immigration to the United States

In March 1949, Defendant sought a determination from the United States Displaced Persons Commission ("DPC") that he was a Displaced Person as defined in the Displaced Persons Act of 1948 ("DPA"), Pub. L. No. 80-774, ch. 647, 62 Stat. 1009, and was therefore eligible to immigrate to the United States under the DPA.  SF 18.  In connection with his application to the DPC, Defendant described his employment and residences from 1941 to 1944.  With respect to his residences, he stated that he was in Kovanca, Poland from 1939 to 1943.  Sf 19.  Regarding his employment, he stated:  (1) that he was "an employee" in Kovanca, Poland from 1939 to 1943; and (2) attended "Special Driver School" in "Lwow," Poland from 1943 to 1944.  Id.  The DPC determined that Defendant was an eligible Displaced Person based on documents and information Defendant submitted. SF 20.

On or about April 21, 1949, Defendant filed an Application for Immigration Visa and Alien Registration with the American Consulate in Munich, Germany, to obtain an immigrant visa to enter the United States under the DPA.  Sf 21.  On his visa application, Defendant described his residences from 1939 to 1944.  He stated that, from 1939 to August 1943, he had resided in "Komantscha," Poland and from August 1943 to July 1944, he resided in Lemberg (i.e., L'viv), Poland.  SF 22.  The application states that Defendant's occupation was "shop assistant."  Id.

20

A U.S. Vice Consul personally interviewed Defendant, who  swore to the truth of the information on his visa application. SF 23.  Based on the information provided by Defendant to U.S. authorities, on or about April 22, 1949, it issued Immigrant Visa No. 880680 under the DPA to Defendant.  Defendant used this visa to enter the United States at the Port of New York on or about May 4, 1949.  SF 24, 25.

On or about September 15, 1955, Defendant signed and filed a Petition for Naturalization with the United States Immigration and Naturalization Service.  SF 26.  He orally swore to the truth of the information he provided therein.  Id.

On October 11, 1955, the United States District Court for the Eastern District of Michigan granted Defendant's Petition for Naturalization and issued to him Certificate of Naturalization No. 7536855.   SF 27.

Mr. Kalymon admitted that he did not tell the truth about his employment because he feared repatriation to the Soviet Union.   The Government offered the deposition testimony of three witnesses to explain the relevance of employment in the emigration process under the DPA.

Mario DeCapua testified as an expert regarding the operation of the United States Displaced Persons Commission, the agency charged with implementing the DPA. DeCapua served from 1948 until 1952, as the head of the Security Investigations Division of the DPC.  He helped prepare the Inimical List, a listing of organizations whose members were ineligible for admission under the DPA.  The UAP is not on the list.  P169 at 17.  The list contained organizations that were affiliated politically with the Nazi regime.  Id. at 18. According to DeCapua, the list was not exclusive, membership in organizations not named on the list also could be disqualified under the DPA.  Id. at 20.

DeCapua also described the screening procedures a case analyst was required to follow when processing visa applications under the DPA.  Id. at 38-42.  He testified that an investigator paid particular attention to the activities of young men of military service age

21

who lived in areas occupied by German forces during the war. Id. at 39. Wartime activities would be noted in a report to the DPC. DeCapua was unaware of the UAP during his tenure. Id. at 28.

William Arket, a former U.S. Army Counterintelligence Corps ("CIC") agent, also testified regarding the background investigation required by the DPA. P168. Arket stated that a CIC agent prepared a written report that included the applicant's background and activities. Arket himself investigated Defendant's background. Id. at 5. According to Arket, he routinely asked applicants about their wartime employment. Id. at 35. Defendant did not include his service in the UAP. That information, had it been provided, would have been recorded in Defendant's CIC investigative report because employment in a police force in Nazi-occupied territory was considered derogatory. Id. at 38-65. SF 8, 16.

Kenneth R. Smith, a former U.S. Department of State Vice Consul, also testified on behalf of the government. P170. Smith served from 1950 through 1953, in Germany, where he issued immigrant visas under the DPA. Id. at 16-17. Smith testified that information that an applicant had served in a police unit in an area occupied by Nazi forces, if known to the Vice Consul, would have tended to affect the decision regarding eligibility. Id. at 18-22. He added that information that the unit enforced persecutory measures against Jews, Gypsies, and other populations considered racially undesirable by Nazi Germany, would have resulted in the rejection of Defendant's application. Id. at 27, 48.

## IV. CONCLUSIONS OF LAW

If citizenship is illegally procured, it may be revoked and a Certificate of Naturalization may be cancelled. 8 U.S.C. § 1451(a). Fedorenko v. United States, 449 U.S. 490, 514-15 (1981). Lawful admission for permanent residence requires a valid visa and legal eligibility for that visa. 8 U.S.C. § 1181(a). Fedorenko, 449 U.S. at 506, 508, 515. A determination of the lawfulness of admission is made according to the law in effect at the time of inital entry into the United States. Id. at 507, 514. In this case, Defendant

entered into the United States through a visa issued under the Displaced Persons Act of 1948.  Congress enacted the DPA in 1948, to enable refugees from Europe to emigrate to the United States without regard to immigration quotas.  Fedorenko, 449 U.S. at 495.  Therefore, the Court examines the lawfulness of Mr. Kalymon's entry under the Act.  In addition, State Department regulations in effect at the time he applied for his visa are relevant.  22 C.F.R. §§ 53.32, 53.55 (1949).

The burden to establish eligibility as a displaced person is on the applicant.  United States v. Mandycz, 359 F.Supp.2d 601, 618 (E.D. Mich.), aff'd, 447 F.3d 951 (6th Cir. 2006).  The government's burden in this denaturalization action is to prove its case by "clear, unequivocal and convincing evidence."  Fedorenko, 449 US. at 505-06. The evidence must not leave the "issue in doubt."  Id.  In applying that standard to the facts of this case, the Court makes the following legal conclusions.

### A.  Assistance in Persecution

The DPA, in designating who was a "displaced person" eligible for immigration, incorporated by reference the definition in Annex I to the Constitution of the International Refugee Organization (IRO).  DPA Section 2(b), 62 Stat. 1009, 1013 (1948).  That definition excluded from displaced persons status, and thus barred from entry into the United States, any person who had "assisted the enemy in persecuting civil popula- tions. . . ."  Annex I, Part II, Section 2(a), reprinted in 62 Stat. 3037 at 3051-52 (1948). See Fedorenko, 449 U.S. at 495 n. 3 & 4, 510-11.  Persecution refers generally to "the infliction of sufferings, harm, or death upon those who differ. . .in a way regarded as offensive" and "a campaign having for its object the subjugation or extirpation of the adherents of a religion."  Mandycz, 359 F. Supp. 2d at 617-18 (quoting United States v. Sokolov, 814 F.2d 864, 874 (2d Cir. 1987) (citation omitted)).  See United States v. Reimer, 356 F.3d 456, 462 (2d Cir. 2004); United States v. Schmidt, 923 F.2d 1253, 1256 n.6 (7th Cir.), cert. denied, 502 U.S. 921 (1991).

23

An individual need not be shown to have committed a particular murder, atrocity, or a specific persecutory act, to be excludable for assisting in persecution under DPA Section 2(b). Fedorenko, 449 U.S. at 510 n.32; Demjanjuk, 367 F.3d at 637; United States v. Ciurinskas, 148 F.3d 729, 734 (7th Cir. 1998). Nor is it necessary for the Government to show that an individual served voluntarily. Fedorenko, 49 U.S. at 512; Demjanjuk, 367 F.3d at 637; Mandycz, 359 F. Supp. 2d at 618. However, mere membership in an organization which may have persecuted civilians is not enough for disqualification under DPA Section 2(b). See Fedorenko, 449 U.S. at 512 n. 34 (holding that an individual who did nothing more than cut the hair of female inmates before they were executed did not assist in persecution of civilians); See also Alvarado v. Gonzalez, 449 F.3d 915, 927 (9th Cir. 2006) (the inquiry requires "a particularized evaluation of both personal involvement and purposeful assistance").

Under the governing case law, Defendant's participation in normal constabulary duties of the UAP do not, independently or cumulatively, constitute assistance in the persecution of civil populations; however, that is not all that happened here. His claim that the UAP did not assist the Nazi occupation authorities in enforcing anti-Jewish laws is contrary to the historical record in this case. Likewise, his denial that he assisted in the Nazi persecution of the Jews of L'viv is undermined by the documents received into evidence in this case. The Court addresses each below.

The Court has found as a fact that while serving as an employee of the UAP in L'viv during World War II, Defendant performed the routine and daily duties of a Ukrainian Auxiliary policeman. The Court also has found the duties encompassed enforcing persecutory measures against Jews, whom the Nazis deemed dangerous or undesirable because of their race, religion, national origin or political belief. Moreover, as a UAP policeman, Defendant engaged in the so-called "extraordinary" duties with regard to the L'viv Jewish ghetto, such as taking part in sweeps of the ghetto during periodic reduction

24

actions; manning cordon posts around the city to prevent Jews from escaping before and during such actions, and hunting for Jews who attempted to hide or flee.  Such conduct provides a basis  for finding that Defendant assisted in the persecution of civil populations.  See United States v. Osidach, 513 F. Supp. at 60-61, 63, 84-85, 97-99 (D.C. Pa. 1981).  See also United States v. Dailide, 227 F.3d 385, 392 (6th Cir. 2000), cert. denied, 540 U.S. 876 (2003).  Therefore, Defendant was not legally eligible to receive a visa under DPA Section 2(b), as alleged in Count I of the Complaint.

More particularly, the wartime documents show that on at least four occasions, May 11, 1942, August 14, 1942, August 20, 1942, and August 21, 1942, while on duty as a Ukrainian Auxiliary policeman, Defendant fired his weapon.  On May 11, 1942, Defendant guarded a group of Jews being transferred to Pluvhov, a forced labor camp, and expended six rounds of ammunition as part of this operation.  The documents also show that on August 14, 1942, Mr. Kaymon fired four shots, killing one Jew and wounding another; that Mr. Kalymon fired two shots at Jews on August 20, 1942, and again on August 21, 1942, during the Great Operation.

Although Defendant admitted that a report was required if ammunition was used by a UAP policeman, Tr. at 682, 687, he denied that he was the individual named in the reports identified at trial.  The Government met its burden to show that the individual in the reports was indeed the Defendant.  Dr. Pohl, who is fluent in English and German, and reads Ukranian, testified that the name Ivan is the same as Iwan, which were the same as Mr. Kalymon's given name, Jan.  As for the variation from Kalymon to Kalymun, the testimony showed that Mr. Kalymon was born Jan Kalymun, but used the German spelling, Kalymon, at different times in his life.

Accordingly, the Government is entitled to judgment on Count I.

**B.  Membership in a Hostile Movement**

Section 13 of the DPA prohibited issuance of a visa to "any person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States." The degree of participation or involvement in the hostile movement is irrelevant; DPA Section 13 does not consider the role an individual played in the hostile movement. United States v. Koreh, 59 F.3d 431, 444-45 (3d Cir. 1995) (press officer in the Ministry of Propaganda who authored proNazi articles). The "plain language of [DPA] section 13 contains no requirement that a defendant personally participate in any hostile acts committed by the movement, and the legislative history suggests that Congress sought to exclude all members of such groups, regardless of the degree of their participation." Koreh, 59 F.3d at 444-45 Rather, membership *or* participation in a hostile movement *per se* precludes visa eligibility. Consequently, the sole issue is whether the UAP is a hostile movement for purposes of Section 13.

Several factors weigh against the Government's position that the UAP is a hostile movement. First, the Government's own expert, Dr. Pohl, testified unequivocally that the UAP was not a political movement, and distinguished it from many of the organizations on the Inimical List with which he was familiar. Tr. at 572.

Second, the UAP was never listed on the Inimical List, a list that existed at the time the DPA was in effect for use by immigration officials to identify organizations considered hostile movements. See Ciurinskas, 976 F. Supp. at 1182. That list was not exhaustive, and membership or participation in organizations not appearing on the list could also disqualified the applicant from receiving a DPA visa. Id. Hence, the absence of the UAP on the list is not dispositive, but it does create a greater burden on the part of the Government to show it was a hostile movement.

Third, the Court finds the case law replied upon by the Government fails to satisfy its burden. The majority of cases addressing Section 13 involve a defendant's membership in an organization listed on the Inimical List, see e.g. United States v. Ciurinskas, 148 F.3d

729 (7th Cir. 1998) (membership in Lithuanian Schutzmannschaft was sufficient for disqualification under the hostile movement bar, even if there was no showing of active participation); United States v. Breyer, 41 F.3d 884 (3d Cir. 1994) (holding that service as a member of the SS Totenkopf constitutes membership or involvement in a movement hostile to the United States) ; United States v. Koziy, 728 F.2d 1314, 1319 (11th Cir. 1984); United States v. Wittje, 422 F.3d 479 (7th Cir. 2005) (no doubt that the Waffen SS was a movement hostile to the United States), or defendants who worked as armed concentration camp guards.  Further, those decisions cited by the Government as supporting a finding that the UAP should be so considered are distinguishable or nonpersuasive.  See Firishchak, 426 F. Supp. 2d 780,  800 (Agreed Legal Finding # 10) (N.D. Ill. 2005), aff'd 468 F.3d 1015 (7th Cir. 2006) (because the defendant had stipulated the issue was waived on appeal); United States v. Koziy, 728 F.2d 1314, 1319 (11th Cir. 1984) (finding the Organization of Ukrainian Nationalists "OUN" was hostile to the United States and listed on the Inimical List, the Second Congress of the OUN produced a resolution including antisemitic ideology); United States v. Osidach, 513 F. Supp. 51, 97 (E. D. Penn. 1981) (discussing the voluntary aspect of membership in a movement).

As noted by the appellate court in Ciurinskas, 148 F.3d at 729, "§ 13 was intended to cover "political or subversive groups of an ideological character" and "not considered as embracing military, naval, or air forces nor local constabularies."  Here, the police personnel file demonstrates that some ideological training occurred; however, Mr. Kalymon could not recall receiving such training, and there is no evidence that the training differed from that forced upon the native population by the Civil Administration.  Further, those documents containing Information about Nazi policy and agenda were not disseminated to the rank and file.  There is no evidence before this Court that Mr. Kalymon ascribed to  the political ideology of the German Reich.

Accordingly, the Court finds that the Government has failed to meet its burden to show that the UAP was a hostile movement under Section 13 of the DPA.

### C. Misrepresentation

Section 10 of the DPA rendered inadmissible to the United States any alien "who shall willfully make a misrepresentation for the purpose of gaining admission to the United States as an eligible displaced person" under the DPA.  62 Stat. 1013.  Although the DPA does not define "willfulness," "willful" has been defined elsewhere in the INA as requiring only a showing of voluntary and deliberate activity.  See Mwongera v. INS, 187 F.3d 323, 330 (3d Cir. 1999); Witter v. INS, 113 F.3d 549, 554 (5th Cir. 1997); United States v. Reve, 241 F. Supp. 2d 470, 477 (D.N.J. 2003).  Knowledge of the falsity of a representation is sufficient to establish willfulness; a specific intent to deceive is not required.  Mwongera, 187 F.3d at 330 (citations omitted).

In addition, a misrepresentation must be material for it to be disqualifying under Section 10.  See Fedorenko, 449 U.S. at 507.  The Government is not required under this standard to prove that Defendant would not have received a visa had he not made the misrepresentation.  Kungys, 485 U.S. at 771.  A misrepresentation is "material" if it would have a natural tendency to influence the relevant decision-maker's decision.  See Kungys v. United States, 485 U.S. 759, 770-71 (1988).  The materiality of a misrepresentation in a denaturalization proceeding is a question of law.  Id. at 772.

Mr. Kalymon admitted that he concealed his UAP service when the U.S. Counterintelligence Corps investigated his background as part of the determination by the Displaced Person Commission.  He also admitted he concealed his UAP service when he sought a visa under the Displaced Persons Act.  He lied about his service and his places of residence because he was fearful he would not get a visa if he told the truth.  The Court finds that Defendant willfully lied to U.S. immigration authorities about his wartime activities in order to obtain a visa, including the U.S. Army Counterintelligence Corps ("CIC") agent

who conducted the mandatory background investigation of Defendant required by DPA § 10.  Further, Defendant's false statements to the CIC were incorporated into a report that was relied upon by the Displaced Persons Commission ("DPC") in determining whether Defendant was an eligible "displaced person" within the meaning of the DPA.  Finally, the Court concludes that Defendant willfully misrepresented his UAP employment  to the vice consul who processed his visa application and interviewed Defendant.

In addition, Defendant's wartime activities, in particular his employment in the UAP in L'viv, and his activities as a Ukrainian Auxiliary policeman, were material facts capable of affecting the decision of the DPC and the vice consul who reviewed Defendant's visa application as to whether he was eligible under the DPA for an immigrant visa.  See Kowalchuk, 773 F.2d at 497 (immigration officials paid "[c]lose attention . . . to the applicant's occupation and residence during the war years and the applicant had the burden under the law of proving eligibility for a visa.  Persons who had served in the Ukrainian police or militia would have been ineligible" (emphasis added)); Maikovskis v. INS, 773 F.2d 435, 442 (2d Cir. 1985) (a visa applicant "who was known to have served with the Latvian police would have had his background fully investigated to determine whether he assisted in persecution"), cert. denied, 476 U.S. 1182 (1986); Koziy, 728 F.2d at 1319-20 ("if [Koziy] had disclosed his connection with the police force in his visa application, his application would have been rejected outright, or at the least, an investigation would have commenced;" Osidach, 513 F. Supp. at 101-102 (claim by Ukrainian policeman that he had been a "dairy technic [sic]" was a material misrepresentation under DPA Section 10).

The Court concludes that Defendant therefore made a willful and material misrepresentation of his wartime activities for the purpose of gaining admission to the United States as an eligible displaced person" under the DPA, and was ineligible under

DPA Section 10 to receive a visa.  Accordingly, the Government has proven it is entitled to judgment on that Count.

### D.  Advocacy or Acquiescence in Activities Contrary to Civilization and Human Decency

At the time Defendant entered the United States, regulations promulgated by the Department of State (pursuant to authority delegated by Presidential proclamation) forbade the issuance of a visa to any alien whose entry would be prejudicial to the United States. 22 C.F.R. §§ 53.32, 53.33 (1949).  Among those aliens whose entry was deemed prejudicial to the United States were any person who "advocated or acquiesced in activities or conduct contrary to civilization and human decency on behalf of the Axis countries during . . . [World War II]."  22 C.F.R. § 53.33(j) (1949).  <u>Ciurinskas</u>, 976 F. Supp. at 1187-88; <u>United States v. Baumann</u>, 764 F. Supp. 1335, 1337 (E.D. Wis. 1991), <u>aff'd</u>, 958 F.2d 374 (7th Cir. 1992), <u>cert. denied</u>, 506 U.S. 831 (1992).

Defendant advocated or acquiesced in activities or conduct contrary to civilization and human decency while he was employed as a private in the UAP.  Defendant therefore was ineligible as a matter of law to receive a visa under State Department regulations. Accordingly, the Government has proven the allegations in Count IV of the Complaint, and is entitled to judgment on that Count.

## V.  CONCLUSION

In conclusion the Court holds that the quantum of evidence presented by the Government on three of its four bases for denaturalization meets the clear, convincing, and unequivocal burden articulated in <u>Fedorenko</u>.  Any one of the three, standing alone, provides a sufficient basis for the requested relief.  Therefore, judgment is granted against Defendant and in favor of the Government in this matter.

Certificate of Naturalization No. 7536855 shall be cancelled and the order of the United States District Court for the Eastern District of Michigan dated October 11, 1955, admitting Defendant to citizenship, shall be revoked.

Defendant must surrender and deliver Certificate of Naturalization No. 7536855 and any United States passport or other documentary evidence of United States citizenship he may have to the United States Department of Justice forthwith.

**IT IS SO ORDERED.**


s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE


DATE: March 29, 2007


## CERTIFICATE OF SERVICE

A copy of this Order was served upon all counsel of record on this date.


s/Bernadette M. Thebolt
Deputy Clerk